**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**December 17, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

LEIF EVERETT HAYMAN,

    Defendant - Appellant.

No. 24-2136
(D.C. No. 2:22-CR-01205-MIS-1)
(D.N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **TYMKOVICH**, and **McHUGH**, Circuit Judges.
_____

Defendant-Appellant Leif Everett Hayman[1] appeals her 120-month sentence

for murder-for-hire. Ms. Hayman is an individual with an intellectual disability. In

2022, she was arrested after attempting to hire a hitman on the parody website

rentahitman.com to kill her girlfriend's mother. Ms. Hayman pleaded guilty to using

interstate commerce facilities with the intent to commission a murder in violation of

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rules of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

[1] Ms. Hayman is a transgender woman. Because she began transitioning after the events relevant to this case, the record refers to Ms. Hayman using both male and female pronouns and titles. For consistency, and in accordance with her briefing, we refer to Ms. Hayman using female pronouns and a female title.

18 U.S.C. § 1958(a). The district court imposed a sentence of 120 months'
imprisonment, the statutory maximum for the offense. On appeal, Ms. Hayman
contends that her 120-month sentence was procedurally and substantively
unreasonable. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.    BACKGROUND

### A.    *Factual Background*

Ms. Hayman has an intellectual disability. Because of her intellectual
disability, she lived in an assisted care facility with full-time caregivers from 2017
until her arrest in 2022. In 2021, Ms. Hayman began dating Danielle, a twenty-one-
year-old woman with an intellectual disability and autism. Ms. Hayman and Danielle
planned a wedding ceremony together, but they never legally married. Nevertheless,
Ms. Hayman referred to Danielle as her wife during the relevant period.

P.H. is Danielle's mother and guardian. P.H. had concerns about Danielle's
relationship with Ms. Hayman. She thought Ms. Hayman was possessive of Danielle
and described Ms. Hayman's behavior as "unhinged" and "manipulative." ROA
Vol. II at 104. In April 2022, after an incident where Danielle attempted suicide "to
avoid running away with [Ms.] Hayman" like Ms. Hayman wanted, P.H. spoke with
Ms. Hayman's caretakers about her concerns. *Id.* Ms. Hayman was present for some
of the conversation and became very upset, to the point that P.H. feared that
Ms. Hayman would attack her.

On April 10, 2022, Ms. Hayman submitted an inquiry on the parody website
rentahitman.com asking for someone to "hurt" P.H. *Id.* at 100. Ms. Hayman included

P.H.'s photo, address, phone number, and email address, and she wrote, "I want her gone now . . . . [S]he's controlling my wife." *Id.* Receiving no response, Ms. Hayman sent another inquiry a week later. Ms. Hayman wrote, "I hate her so much I want her gone now" and "Kill that bitch." *Id.* The next day, she wrote again: "[I]f you don't do it I will do it myself . . . . I want her gone now." *Id.* Over the next two weeks, she sent five additional requests to the website, insisting that "it seriously needs to happen NOW" and stating that if rentahitman.com would not help, "I'm doing it my fu**ing self thank you for nothing fake people." *Id.* at 100–01.

The website owner contacted the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). On May 5, 2022, an undercover ATF agent posing as a hitman contacted Ms. Hayman and asked if she was still interested in his services. She responded, "Yes I am still interested." *Id.* at 101. The agent and Ms. Hayman later spoke on the phone. During their phone conversation, the agent asked Ms. Hayman whether she wanted the target "gone off this earth," and she replied "yes" "I do." *Id.* She explained that the target was her "wife's mom" and described her as "a fu**ing bitch [who] deserves to die after what she did to me and [my wife] a few weeks ago." *Id.* at 101–02. The agent asked Ms. Hayman when the job needed to be done, and she replied, "as soon as possible." *Id.* at 101. The agent then asked Ms. Hayman how she planned to pay. She responded that she "was informed the service was free." *Id.* After the agent said that payment was required, Ms. Hayman agreed to pay $200. She said she planned get the money from Danielle.

3

Ms. Hayman informed the agent that she did not care how the murder was done as long as it was done "as quickly as possible" and "with no evidence." *Id.* The agent told Ms. Hayman that "the fastest and cleanest" method was to use a gun. *Id.* Ms. Hayman agreed at first, but when the agent stated that she would need to pay $500 to buy a gun, Ms. Hayman suggested using knives, a bat, or a rock to "smash [P.H.'s] head in multiple times" instead of a gun. *Id.* at 101–02.

The next day, Ms. Hayman sent P.H.'s address and photograph to the agent. She said, "[My wife] is only giving me 53 dollars so let's use the baseball bat and I'll give you the rest of the money after we do it." *Id.*

On May 9, 2022, Ms. Hayman and the agent spoke on the phone again. Ms. Hayman informed the agent that she lived with full-time staff, so the agent was "going to have to hurt [the caregiver] too" or "at least scare [the] caretaker to not tell anybody that [she] would be gone." *Id.* She and the agent agreed that the agent would carry out the murder on May 11, 2022. Ms. Hayman planned to sneak out of her residence and meet up with the agent on that day.

On May 10, the day before the planned meeting, Ms. Hayman texted the agent, "I'm actually ready today thinking about doing it myself cuz like I told you I don't have time to wait but if I don't do it tonight than I will be ready for you tomorrow." *Id.* at 103. The agent called her, and convinced Ms. Hayman not to act alone. They agreed to meet the next day at a cemetery in Las Cruces, New Mexico near Ms. Hayman's residence.

On May 11, the agent arrived at the cemetery at the agreed-upon time, but Ms. Hayman was not there. The agent sent a group text message to Danielle and Ms. Hayman asking where Ms. Hayman was. Danielle responded, "[sh]e's at [her] backyard house waiting for you" and "[s]he want you to pick [her] up at [her] house." *Id.* The agent drove to Ms. Hayman's house but did not see her in the front or back yard. The agent then saw two individuals walking near the residence: One of them was Ms. Hayman, and one of them was Ms. Hayman's caretaker. As the agent approached, Ms. Hayman gestured to the caretaker "as if [Ms.] Hayman wanted the [agent] to do something to [him]." *Id.* Ms. Hayman asked the agent, "[W]here were you[?] I was waiting for you." *Id.* The caretaker tried to keep Ms. Hayman away from the agent, and Ms. Hayman said to the agent, "this is part of the deal." *Id.* The caretaker then stated that the police had been contacted, and the agent drove away. Soon after, Ms. Hayman was arrested and charged with using interstate commerce facilities with the intent to commission a murder under 18 U.S.C. § 1958(a).

### B.    *Procedural History*

### 1.    Competency Proceedings

In September 2022, defense counsel bought a motion to determine competency based on concerns that "due to a mental illness and/or cognitive defects, [Ms.] Hayman may be unable to comprehend the nature and consequences of the proceedings against [her] or assist counsel in [her] defense." ROA Vol. II at 5. In support of the motion, she submitted a psychiatric examination report prepared by Dr. Noah Kaufman. In the report, Dr. Kaufman opined that Ms. Hayman could

understand the reasons for punishment but that she did not have a rational and factual understanding of the proceedings and would have difficulty consulting with an attorney. Overall, Dr. Kaufman opined that Ms. Hayman was not competent to stand trial.

As a result of Dr. Kaufman's report, the court committed Ms. Hayman to the Bureau of Prisons ("BOP") to determine whether she could be treated to attain competency. About ten months later, the Metropolitan Correctional Center, Chicago issued a "Certificate of Restoration of Competency to Stand Trial." *Id.* at 77–78. The facility attached an evaluation of Ms. Hayman completed by Dr. Yasmeen Abdelaal, a forensic psychologist. In the evaluation, Dr. Abdelaal opined that although Ms. Hayman has "a mild intellectual developmental disorder[,] . . . this mental disease or defect is not rendering the defendant mentally incompetent to the extent that she is unable to understand the nature and consequences of the proceedings or to assist properly in her defense." *Id.* at 97.

Thereafter, the court held a competency hearing at which both Dr. Kaufman and Dr. Abdelaal testified. In the competency hearing, Dr. Kaufman criticized Dr. Abdelaal's reliance on observation over objective testing and testified that Dr. Abdelaal's opinion about Ms. Hayman's competency was unsupported. Dr. Abdelaal disagreed, testifying that observations are an important part of determining competency. And she reiterated that, based on her observations, Ms. Hayman was competent to stand trial "with some support." ROA Vol. III at 157.

The court agreed with Dr. Abdelaal and, in November 2023, issued an order finding Ms. Hayman competent to stand trial.

**2.       Presentence Report**

In January 2024, Ms. Hayman pleaded guilty to one count of using interstate commerce facilities with the intent to commission a murder in violation of 18 U.S.C. § 1958(a). A presentence report ("PSR") was prepared ahead of sentencing.

The PSR included information about Ms. Hayman's history. According to the PSR, Ms. Hayman's mother used cocaine and methamphetamine while Ms. Hayman was in utero, and Ms. Hayman was born addicted to cocaine and methamphetamine. She has been diagnosed with several medical conditions, including type 1 diabetes, cerebral palsy, anxiety disorder, anti-social disorder, mild intellectual disorder, and gender dysphoria.

Ms. Hayman lived with her biological mother until the age of three and was then adopted by Robert Hayman and Debbie Helmick. Her adoptive mother, Ms. Helmick, was Ms. Hayman's main caretaker until around 2017. Ms. Helmick stated that, when Ms. Hayman was in her care, she exhibited "concerning behaviors . . . includ[ing] becoming agitated easily and expressing sexual desires for younger females." ROA Vol. II at 110. Ms. Helmick stopped being Ms. Hayman's caretaker because "she could not control [Ms. Hayman] anymore" after an incident where Ms. Hayman "threatened to kill her, and fled to Mexico." *Id.* at 108.

Ms. Hayman's adoptive sister, Terrah Anderson, reported four physical altercations with Ms. Hayman beginning around 2015. Ms. Anderson also reported

7

that, in 2016, Ms. Hayman began communicating with someone in Mexico named "Shay" who claimed to be raising an eight- or nine-year-old child. *Id.* at 108–09. Ms. Hayman "became infatuated with obtaining the child" and later that year stole $3,200 from Ms. Helmick, hitchhiked to El Paso, Texas, and eventually made it to Mexico. *Id.* at 109. When she arrived in Mexico, Ms. Hayman contacted Shay, who refused to let her take the child and told her never to return.

Ms. Anderson reported that, after Ms. Hayman fled to Mexico, Ms. Anderson and Ms. Helmick searched Ms. Hayman's room and found "several notes that detailed [Ms.] Hayman's plan to kill both [Ms. Anderson] and [Ms.] Helmick." *Id.* They also found notes indicating that Ms. Hayman was planning to kill her caregivers by "cheeking" medication and then crushing it up and putting it in the caregivers' food. *Id.* The notes stated that, once the caregivers were "dead or incapacitated," Ms. Hayman planned to kidnap a twelve-year-old child that she had a "crush" on. *Id.* The child was the daughter of Ms. Anderson's friend, and Ms. Hayman indicated in her notes that if Ms. Anderson or the child's mother tried to interfere with the kidnapping, she would kill them with a baseball bat.

After this incident, Ms. Hayman was transferred to a group home to allow for constant monitoring. At one point in 2020, Ms. Hayman disabled the home's alarm system and exited through a window. She was brought to the hospital for an ankle injury she sustained while escaping, where staff discovered that she was a missing person and apprehended her. Ms. Hayman later admitted that the incident was part of a plan to return to Mexico.

8

The PSR also recommended a total offense level of 34 under the U.S. Sentencing Commission Guidelines. It reached this score by first applying U.S.S.G. § 2E1.4, the guideline for the use of interstate commerce facilities in the commission of murder-for-hire in violation of 18 U.S.C. § 1958(a). Section 2E1.4 provides for a base offense level of 32 or "the offense level applicable to the underlying unlawful conduct," whichever is greater. U.S.S.G. § 2E1.4(a). Finding that the "underlying unlawful conduct" here was solicitation to commit murder, the PSR looked to the guideline for that offense, § 2A1.5, to provide the appropriate offense level. *Id.* Under § 2A1.5, Ms. Hayman's offense level was 37, including a base offense level of 33 and a four-level enhancement because the offense "involved the offer or the receipt of anything of pecuniary value for undertaking the murder." ROA Vol. II at 105. (citing U.S.S.G. § 2A1.5(b)(1)). Because this offense level was greater than 32, the PSR recommended applying the offense level of 37 from § 2A1.5. It also recommended applying a three-level credit for acceptance of responsibility, bringing her final offense level to 34.

Because Ms. Hayman had no criminal history, the PSR recommended assigning her a criminal history category of I. Based on her offense level of 34 and criminal history category of I, the Guidelines imprisonment range was 151 to 188 months. But because that range exceeded the statutory maximum term of ten years, 18 U.S.C. § 1958(a), the Guidelines term of imprisonment became 120 months. The PSR then identified the "unique factors" in the case "that relate to 18 U.S.C. [§] 3553(a)(1)–(7)," including Ms. Hayman's intellectual disability and the support

9

services she receives, and it recommended that "a sentence within the advisory guideline range may be warranted in this case." *Id.* at 116–17.

### 3.    Sentencing Hearing

Prior to the sentencing hearing, Ms. Hayman objected to the PSR and requested a sentence of 30 months. She argued that the facts underlying her offense—that she asked a hitman to "hurriedly kill someone with either a knife, a bat, or a rock for virtually no money"—"seem more like a child's plan to get rid of their neighborhood enemy" than a "sophisticated crime carefully plotting someone's death." Supp. ROA at 11. Because her plan was "simple-minded" and "doomed to fail," and because she "accepted responsibility" for the conduct, Ms. Hayman argued that a 30-month sentence was appropriate. *Id.*

The Government requested the Guidelines sentence of 120 months. It emphasized that Ms. Hayman's scheme was "deadly serious," ROA Vol. I at 30, and that her "personal characteristics and criminal history suggest problem-solving and decision-making methodologies that are extreme, impulsive, combustible, erratic, reckless, detached from reality, and indiscriminate," *id.* at 33. "In other words, these methodologies are dangerous, and [Ms. Hayman] presents a serious risk of danger to the public." *Id.*

At the sentencing hearing, the district court heard additional arguments from the parties. Ms. Hayman's counsel reasserted her request for a 30-month sentence. Counsel argued that, upon release, Ms. Hayman would be returned to an assisted living facility with around-the-clock services and restrictions on her internet use and

that these restrictions would mitigate potential risks to the public. Counsel also highlighted Ms. Hayman's lack of criminal history. And although he acknowledged that there were "allegations" that Ms. Hayman engaged in violent or threatening behavior, he argued that her alleged conduct was "very childlike." ROA Vol. III at 204.

The district court then invited Ms. Hayman to speak. Ms. Hayman apologized to P.H. and expressed remorse for her crime. She stated, "I never meant to . . . do what I said I was going to do. I lost control of my anger, . . . [and] I have been working on my anger." *Id.* at 208–09. The court then said to Ms. Hayman, "I'm concerned about all the other times you've made plans to kill people" or "threatened to kill . . . people. Do you want to address that at all?" *Id.* at 209. Ms. Hayman responded, "I basically lost touch with reality, and I thought what I was doing was fine." *Id.* at 210. She added, "I didn't think that I was going to be punished, like, because, in my past life, I used to think that I could get away with stuff like this. But through this experience, I've learned that my actions do have consequences." *Id.* The district court told Ms. Hayman that it was imposing a sentence of 120 months, "given [her] very serious actions in this case and the things [she had] done in the past that also involve violence." *Id.* at 211.

The district court adopted the PSR's factual findings and stated that it "considered the Sentencing Guideline applications and the [18 U.S.C. §] 3553(a) factors" in fashioning Ms. Hayman's sentence. *Id.* It found that the 120-month Guidelines sentence was "sufficient but not greater than necessary to comply with the

purposes of 3553(a), including the nature and circumstances of the offense, which were quite serious in this case—the defendant attempting to hire a hitman to have somebody killed—and the history and characteristics of the defendant." *Id.*

The court considered defense counsel's argument about Ms. Hayman's lack of prior criminal history, but it stated that it was "concerned about some of [her] other behavior as laid out in the [PSR]," including her "plans to kill other people and kidnap children." *Id.* at 211–12. It considered "the need for the sentence imposed to reflect the seriousness of the offense," noting that the charged offense is "a very serious offense." *Id.* at 212. Considering the need to "promote respect for the law and provide just punishment" and "to adequately deter criminal conduct and protect the public from further crimes of the defendant," the court expressed that it was concerned by Ms. Hayman's "behavior in this case and . . . in the past." *Id.*

Finally, the court considered "the need to provide the defendant with educational or vocational training, medical care, and all the other treatment, as requested by defense counsel." *Id.* It made "a recommendation for the medical center in Ft. Worth, Texas to assist with those things." *Id.* And it stated that it considered the availability of other sentences, including "no more time in custody," as Ms. Hayman requested. *Id.* at 212. However, the court ultimately concluded that "120 months is appropriate under the [§] 3553(a) factors." *Id.* at 217.

After pronouncing the sentence, the court asked defense counsel, "Does the defendant have an objection to the adequacy of the explanation for any portion of the sentencing[?]" *Id.* at 215. Counsel responded, "Your Honor, I do not object to the

adequacy of your explanations. If I may, though, I would respectfully object to the 120-month sentence as being the statutory maximum." *Id.* at 216. Counsel then argued that imposing the statutory maximum denied Ms. Hayman the benefit of the credit for her acceptance of responsibility because the sentence would have been 120 months regardless of whether she pleaded guilty or proceeded to trial. The court considered the argument but rejected it, finding that "120 months is appropriate." *Id.* at 217.

The court entered judgment. Ms. Hayman timely appealed.

## II.    DISCUSSION

Ms. Hayman argues that the 120-month sentence imposed by the district court was both procedurally and substantively unreasonable. "Reasonableness review is a two-step process comprising a procedural and substantive component." *United States v. Jackson*, 82 F.4th 943, 949 (10th Cir. 2023) (quotation marks omitted). We first review procedural reasonableness by asking "whether the district court committed any error in calculating or explaining the sentence." *Id*. (quotation marks omitted). A district court commits procedural error by "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall v. United States*, 552 U.S. 38, 51 (2007). If the sentence was procedurally reasonable, we then review substantive reasonableness by examining "whether the length of the sentence is

reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *Jackson*, 82 F.4th at 949 (quotation marks omitted).

Ms. Hayman argues that the sentence imposed by the district court was procedurally unreasonable because the district court (1) incorrectly calculated the Guidelines sentencing range and (2) did not adequately explain why it rejected Ms. Hayman's request for a downward variance. She also argues that her sentence was substantively unreasonable because it was irrational for the court to apply the statutory maximum sentence in her case. We address each argument in turn.

### A.    *Procedural Reasonableness*

Ms. Hayman argues that her 120-month sentence is procedurally unreasonable because the district court (1) incorrectly calculated the Guidelines sentencing range and (2) did not adequately explain why it rejected Ms. Hayman's request for a downward variance.

### 1.    Calculation of the Guidelines Sentencing Range

Ms. Hayman first argues that the district court incorrectly calculated her Guidelines sentencing range. She asserts that the district court erred by using U.S.S.G. § 2A1.5, the guideline for solicitation to commit murder, to calculate her offense level.

Because she did not object to the district court's calculation of the Guidelines sentencing range, we review the district court's decision for plain error. *United States v. Buonocore*, 416 F.3d 1124, 1128–29 (10th Cir. 2005). To obtain relief under the plain-error standard of review, Ms. Hayman must establish "(1) error; (2) that is

plain; (3) that affects [her] substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 1129. The party invoking this rigorous standard must satisfy each of these four prongs. *See United States v. Berryhill*, 140 F.4th 1287, 1302 (10th Cir. 2025). As we explain, Ms. Hayman's challenge to the district court's calculation of her Guidelines sentencing range fails at the second step of the plain-error analysis because she cannot show that any error was plain.

Ms. Hayman was convicted of using interstate commerce facilities in the commission of murder-for-hire in violation of 18 U.S.C. § 1958. The appropriate sentencing guideline for a violation of § 1958 is U.S.S.G. § 2E1.4, use of interstate commerce facilities in the commission of murder-for-hire. *See* U.S.S.G. App'x A. This guideline provides a base offense level of either 32 or "the offense level applicable to the underlying unlawful conduct," whichever is greater. U.S.S.G. § 2E1.4(a). The district court determined that the underlying unlawful conduct here was solicitation to commit murder, and so it applied the offense level specified in § 2A1.5. That guideline provides a base offense level of 33 and adds a four-level enhancement for an offense, like this one, that "involved the offer or the receipt of anything of pecuniary value for undertaking the murder." U.S.S.G. § 2A1.5(b). The district court thus determined that Ms. Hayman's offense level under § 2A1.5(b) was 37. Because this offense level was higher than 32—the default offense level under § 2E1.4(a)(1)—the court applied this higher offense level in accordance with § 2E1.4(a)(2).

15

Ms. Hayman does not dispute that the charged conduct constitutes solicitation to commit murder or that applying § 2A1.5 would result in an offense level of 37. Rather, she contends that the district court erred in applying § 2A1.5 to determine her offense level because solicitation to commit murder could not be the "underlying unlawful conduct" applicable under § 2E1.4(a)(2). She asserts that it is "impossible to use interstate commerce in commission of murder-for-hire [under 18 U.S.C. § 1958] without also soliciting a murder," Reply Br. at 12, and so applying § 2E1.4's cross reference to § 2A1.5 would render § 2E1.4 superfluous because, in every case, the "underlying unlawful conduct" would be solicitation to commit murder. Since canons of statutory construction instruct that courts should avoid interpretations that render parts of a statute void, Ms. Hayman contends that "[t]he term 'underlying unlawful conduct' must mean something more than the conduct necessarily prohibited by 18 U.S.C. § 1958." Appellant's Br. at 23. Thus, she argues that the district court erred by applying U.S.S.G. § 2E1.4(a)(2) and § 2A1.5 rather than § 2E1.4(a)(1) to supply Ms. Hayman's offense level. For its part, the Government disagrees that applying the cross reference to § 2A1.5 causes a redundancy problem because "[n]ot every [18 U.S.C.] § 1958 offense involves a solicitation to murder." Appellee's Br. at 13.

Ms. Hayman's argument hinges on the interpretation of 18 U.S.C. § 1958(a). A violation of § 1958(a) occurs when "the defendant: (1) used or caused another to use any facility of interstate or foreign commerce; (2) with the intent that a murder be committed; (3) as consideration for a promise or agreement to pay anything of

16

pecuniary value." *United States v. Robertson*, 473 F.3d 1289, 1292 (10th Cir. 2007); *see also* 18 U.S.C. § 1958(a). Ms. Hayman asserts that the consideration element of § 1958 requires either a "payment now or a promise or agreement to pay in the future." Appellant's Br. at 23 (quoting *United States v. Wicklund*, 114 F.3d 151, 154 (10th Cir. 1997)). In other words, under Ms. Hayman's reading of the statute, an offer of payment must have been made or accepted before § 1958 can be violated, meaning that anyone who violates § 1958 is also guilty of solicitation to commit murder.

In contrast, the Government argues that a violation of § 1958 "is complete when the defendant travels or uses the interstate commerce facility with the requisite intent." Appellee's Br. at 14. Under this interpretation, a defendant can violate the statute without making or accepting an offer of payment, which is required for solicitation to commit murder. Thus, the Government asserts that not every § 1958 offense involves solicitation of murder, and there is therefore no redundancy in applying § 2A1.5 to the cross-reference in § 2E1.4(a)(2).

We need not decide, however, which interpretation of § 1958 is correct. Even if we assume that the district court erred by applying § 2E1.4(a)(2)'s cross-reference to solicitation to commit murder, Ms. Hayman has not shown that the error was plain. "For an error to be plain . . . , it must be clear or obvious under current law." *United States v. Silva*, 981 F.3d 794, 797 (10th Cir. 2020) (internal quotation marks omitted). A defendant can show that an error was clear or obvious by "showing that the Guidelines are clearly and obviously limited to the interpretation he advocates,"

17

*id.* (brackets omitted), or by citing "precedent directly in point from the Supreme Court or our circuit or a consensus in the other circuits," *United States v. Smith*, 815 F.3d 671, 675 (10th Cir. 2016). Ms. Hayman has not met this burden.

Here, the plain text of the Guidelines suggests that § 2A1.5 supplies the base offense level when a defendant's violation of § 1958 constitutes solicitation to commit murder. *See United States v. Summers*, 506 F. Supp. 2d 686, 696 (D.N.M. 2007). And no binding precedent supports Ms. Hayman's position that it is error to apply § 2A1.5 to supply the offense level for convictions under § 1958. Ms. Hayman concedes this point, stating that "[t]his Court has yet to directly address the issue." Appellant's Br. at 24. Moreover, to the extent that there is a consensus among circuits about the application of § 2A1.5 for convictions under § 1958, it cuts against Ms. Hayman's position. "[O]ther circuits have unanimously approved the use of U.S.S.G. § 2A1.5(a) for assessing the base offense level of convictions under 18 U.S.C. § 1958." *United States v. Cordero*, 973 F.3d 603, 625 (6th Cir. 2020). Likewise, several circuits have held that a person can be convicted of violating § 1958 without soliciting murder. *See United States v. Lisyansky*, 806 F.3d 706, 710 (2d Cir. 2015); *United States v. Smith*, 755 F.3d 645, 647 (8th Cir. 2014). We therefore conclude that even if the district court erred in calculating Ms. Hayman's offense level, which we do not decide, such error was not clear and obvious under current law.

Because Ms. Hayman has failed to establish the second requirement for plain-error review, the district court did not plainly err in calculating her Guidelines

18

sentencing range. We accordingly reject Ms. Hayman's argument without addressing the remaining three prongs of the plain-error test.

**2.      Adequacy of Explanation for the Sentence**

Ms. Hayman next argues that the district court erred by failing to adequately explain why it rejected her request for a downward variance. Before turning to the merits of this challenge, we address whether defense counsel's acquiescence to the adequacy of the district court's explanation at the sentencing hearing waived Ms. Hayman's right to raise this issue on appeal.

*a.      Waiver*

The Government argues that Ms. Hayman waived her right to challenge the adequacy of the district court's explanation for her sentence. It points to an exchange between defense counsel and the court during the sentencing hearing in which the court asked, "Does the defendant have an objection to the adequacy of the explanation for any portion of the sentencing . . . ?" ROA Vol. III at 215. Counsel responded, "Your Honor, I do not object to the adequacy of your explanations." *Id.* at 216. The Government argues that this statement was an intentional relinquishment of a challenge to the adequacy of the court's explanation, such that appellate review is "waived, and not merely forfeited." Appellee's Br. at 17. Ms. Hayman contends that we should treat counsel's statement as a forfeiture rather than a waiver because there is no evidence that Ms. Hayman made an intentional and deliberate decision to waive the issue. We agree with Ms. Hayman.

19

"[N]ot every unpreserved claim of error is entitled to plain error review." *United States v. Malone*, 937 F.3d 1325, 1327 (10th Cir. 2019) (quotation marks omitted). There are generally "two species of preservation issues that arise from a litigant's conduct in the trial court: forfeiture and waiver." *In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th 1126, 1180 (10th Cir. 2023). "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). "Waiver occurs when a party deliberately considers an issue and makes an intentional decision to forgo it. While forfeiture comes about through neglect, waiver is accomplished by intent." *Malone*, 937 F.3d at 1327. "A party that has *forfeited* a right by failing to make a proper objection may obtain relief for plain error; but a party that has *waived* a right is *not* entitled to appellate relief." *Id.* (quotation marks and brackets omitted).

A defendant's affirmative statement of no objection constitutes waiver only when the evidence shows that a party has intentionally relinquished or abandoned the argument. For example, in *United States v. Carrasco-Salazar*, 494 F.3d 1270 (10th Cir. 2007), we considered whether a defendant waived his objections to the PSR when he affirmatively stated to the court that his prior objections had been resolved. *Id.* at 1272. We held that the defendant's statement to the court constituted "knowing and voluntary" waiver, reasoning that "[t]here can be no clearer 'intentional relinquishment or abandonment of a known right,' than when the court brings the defendant's prior objection to his attention, asks whether it has been

20

resolved, and the defendant affirmatively indicates that it has." *Id.* at 1273 (quoting *Olano*, 507 U.S. at 733).

But where the record does not reflect that a party intentionally abandoned an issue, we have held that even affirmative statements indicating no objection should be treated as forfeiture rather than waiver. In *United States v. Zubia-Torres*, 550 F.3d 1202 (10th Cir. 2008), the district court asked the defendant during the sentencing hearing whether he had anything to say on the calculation of a sentencing enhancement, and defense counsel responded, "Your Honor, the offense was correctly calculated by Probation. Our issue is whether or not it's a *Booker* issue." *Id.* at 1204 (quotation marks omitted). When the defendant later appealed the sentencing enhancement, the government argued that he had waived the argument. *Id.* at 1204–05. We disagreed. We held "that there must be some evidence that the waiver is knowing and voluntary, beyond counsel's rote statement that she is not objecting." *Id.* at 1207 (internal quotation marks omitted). And we did not find such evidence. Although counsel affirmatively stated that the offense level was properly calculated, we found "nothing in the record to suggest that counsel actually identified the issue related to [the defendant's] sentencing enhancement and either invited the court to make the particular error or abandoned any claim that the enhancement did not apply." *Id.* at 1205.

We also observed that counsel's statement was made "in the context of directing the court's attention to [the defendant's] primary argument." *Id.* at 1205. Thus, we viewed counsel's statement as "merely indicating that she was not raising a

sentencing calculation issue and attempting to draw the court's attention instead" to the primary issue raised. *Id.* In other words, because there was no evidence that defendant's counsel "deliberately considered the unraised issue and made an intentional decision to forego it," the statement constituted forfeiture rather than waiver. *Id.* at 1206.

Here, like in *Zubia-Torres*, nothing in the record suggests defense counsel considered the argument raised on appeal that the district court's explanation was inadequate because it did not properly address Ms. Hayman's intellectual disability. Although counsel did not object to the adequacy of the district court's explanation at any point, there is no evidence suggesting he was aware of this argument. Also like in *Zubia-Torres*, defense counsel's statement "was said in the context of directing the court's attention to his primary argument," *id.* at 1205, even though it appeared on its face to affirmatively abandon an argument. Defense counsel immediately followed his statement that he did not object to the adequacy of the court's explanation by pivoting to a different argument: "If I may, though, I would respectfully object to the 120-month sentence as being the statutory maximum." ROA Vol. III at 216. On this record, we cannot say that counsel made a "conscious or intentional" decision to abandon the argument that the district court's explanation for Ms. Hayman's sentence was inadequate because it did not address her intellectual disability or counsel's arguments for a downward variance. *Zubia-Torres*, 550 F.3d at 1207. Accordingly, Ms. Hayman forfeited, rather than waived, the argument, and the issue is reviewable for plain error.

b.    *Analysis*

Under our plain-error standard, we may grant relief only if Ms. Hayman establishes (1) "error" (2) "that was plain," (3) "that affected [her] substantial rights," and (4) that "had a serious effect on the fairness, integrity or public reputation of judicial proceedings." *United States v. Nunez-Carranza*, 83 F.4th 1213, 1218 (10th Cir. 2023) (internal quotation marks omitted).

Ms. Hayman contends that the district court plainly erred by failing to adequately explain its reasons for her 120-month sentence. She makes two distinct arguments in support of this contention. First, Ms. Hayman argues that the district court erred by failing to "explain, on-the-record" its reasons for rejecting her argument for a downward variance. Appellant's Br. at 29. Second, Ms. Hayman argues that the district court erred by failing to expressly address her intellectual disability in the sentencing decision. As we explain below, both arguments fail at the first step of the plain-error analysis.

i.    <u>Failure to explain reasons for rejecting Ms. Hayman's argument</u>

First, Ms. Hayman argues that the district court erred by failing to address her argument that a downward variance was warranted because of her intellectual disability and the circumstances of the case.

Ms. Hayman's theory is precluded by our caselaw. We have held that a district court need not "address every argument a defendant asserts for a more lenient sentence." *Nunez-Carranza*, 83 F.4th at 1221; *see also United States v. Wireman*, 849 F.3d 956, 958–59 (10th Cir. 2017) ("[W]e have held time and time again that a

23

district court does not run astray of its duty to consider the parties' arguments simply because it does not directly address those arguments head-on." (internal quotation marks and brackets omitted)). Rather, a sentencing court has complied with procedural requirements in rejecting a defendant's non-frivolous request for a downward variance if the record shows that the court "1) entertained the defendant's argument for a downward variance; 2) considered the 18 U.S.C. § 3553(a) sentencing factors, which include the calculation of the advisory sentencing range under the guidelines; and 3) concluded that a within-guideline sentence is appropriate in light of the § 3553(a) factors." *Nunez-Carranza*, 83 F.4th at 1222.

Here, the district court satisfied each of these requirements. First, although the court did not expressly state why it rejected Ms. Hayman's argument for a below-Guidelines sentence, the record shows that the court "entertained" Ms. Hayman's argument. It explicitly stated that it was considering all available sentencing options, including "no more time in custody" as requested by Ms. Hayman. ROA Vol. III at 212. Second, the court considered the 18 U.S.C. § 3553(a) sentencing factors. It explicitly stated that it was considering the factors, and it engaged in a lengthy discussion analyzing many of them. For example, the court expressed concern about Ms. Hayman's prior actions involving violence, including her past plans to kidnap children and threats to kill various people. The court explained that Ms. Hayman's prior conduct implicated several § 3553(a) factors, including her history and characteristics as well as the need to adequately deter criminal conduct and protect the public from further crimes of the defendant. The court also stated that it

24

considered the PSR, which itself identified the "unique factors" in the case that relate to the § 3553(a) factors. ROA Vol. II at 116.

Third, and finally, the district court concluded based on its analysis of the § 3553(a) factors that the within-Guidelines sentence of 120 months was "appropriate" here. ROA Vol. III at 217. It is clear from the court's analysis that it did not "rest on the [G]uidelines alone, but considered whether the [G]uideline[s] sentence actually conforms, in the circumstances, to the 18 U.S.C. § 3553(a) statutory factors." *Nunez-Carranza*, 83 F.4th at 1222 (quotation marks and brackets omitted).

Because the district court satisfied the three elements laid out in *Nunez-Carranza*, it did not err by failing to explicitly address Ms. Hayman's argument for a downward variance.

ii.     Failure to mention Ms. Hayman's intellectual disability

Ms. Hayman next argues that the district court erred by failing to expressly address her intellectual disability in the sentencing decision. She asserts that this case is "nearly identical to," Reply Br. at 5, the facts in *United States v. Colón-Cordero*, 91 F.4th 41 (1st Cir. 2024), in which the First Circuit concluded that a district court's sentencing decision was inadequately explained because the court "never engaged with [the defendant's] intellectual disability as a mitigating characteristic." *Colón-Cordero*, 91 F.4th at 55. But even if we were bound by the reasoning in *Colón-Cordero*, which we are not, the case is distinguishable in several important ways.

First, in *Colón-Cordero*, the district court imposed a significant upward variance from the Guidelines sentencing range. *Id.* at 53. "When a court imposes a sentence above the guidelines sentencing range, it must justify the upward variance." *Id.* at 51 (internal quotation marks and citations omitted); *see also Wireman*, 849 F.3d at 962–63 ("[W]hen a district court has varied upwards from the Guidelines, our cases have generally required the district court to specifically address and reject the arguments the defendant made for a more lenient sentence."). Here, because the district court imposed a Guidelines sentence, the court did not need to "specifically address and reject each of the defendant's arguments for leniency." *Wireman*, 849 F.3d at 963.

Although the First Circuit in *Colón-Cordero* found it important that the district court did not mention the defendant's disability, this issue was made worse because the court offered almost no explanation for its upwardly variant sentence. *Colón-Cordero*, 91 F.4th at 52–53, 56. The court "recited some basic facts about [the defendant] and his case" and then stated that neither the sentence requested by the government nor the one requested by the defendant "reflects the seriousness of the offense, promotes respect for the law, protects the public from additional crimes by [the defendant], nor . . . address[es] the issues of deterrence and punishment." *Id.* at 52. But the court's explanation failed to identify which specific facts in the case motivated its decision, and so it was "impossible to tell" what the court's rationale was for imposing an upward variance or whether the court made an individualized assessment of the defendant at all. *Id.* at 53; *see also id.* at 54 ("[W]e do not know

which reasons—if any—were actually what the sentencing court had in mind when pronouncing sentence.").

On appeal, the First Circuit emphasized that "sometimes a sentence can be deemed adequately explained by drawing fair inferences from the sentencing record." *Id.* at 53 (internal quotation marks, brackets, and citation omitted). But given the sparsity of the district court's explanation, the appellate court found that the district court "did not say enough from which [the appellate court] could *fairly infer* how [the district court] felt about [the defendant's] dominant mitigation argument." *Id.* at 56 (emphasis added).

Here, in contrast, the district court said enough from which we can fairly infer that it considered Ms. Hayman's intellectual disability when assessing the § 3553(a) factors. As explained above, the court walked through each of the § 3553(a) factors in turn and applied the specific facts of the case to them. Although the court did not expressly discuss Ms. Hayman's intellectual disability, her disability was central to nearly all of Ms. Hayman's arguments for leniency. For example, Ms. Hayman emphasized that, because of her disability, her plan to hire a hitman was "simple-minded," "doomed to fail," and "more like a child's plan" than a "sophisticated crime." Supp. ROA at 11. And she argued multiple times to the district court that her placement in an assisted living facility with full-time care mitigated any potential risk to the public from her future crimes. The court was also familiar with Ms. Hayman's intellectual disability and its implications on her culpability from presiding over her competency hearing.

27

Based on these facts, it is reasonable to infer that the court considered Ms. Hayman's argument that a downward variance was warranted because of her intellectual disability but ultimately found this argument unpersuasive. Accordingly, Ms. Hayman has not shown that the district court "completely ignored" her intellectual disability as a mitigating factor in this case. *Colón-Cordero*, 91 F.4th at 55.

In sum, Ms. Hayman has not met the first requirement for plain-error review because she has not shown that the district court erred by inadequately explaining her 120-month sentence. We therefore deny the relief she requests, and we decline to address the remaining three prongs of the plain-error test.

### B.    *Substantive Reasonableness*

Ms. Hayman argues that her 120-month sentence was substantively unreasonable because it was irrational for the court to impose the statutory maximum sentence in this case in light of Ms. Hayman's intellectual disability. The Government, in turn, argues that Ms. Hayman has not rebutted the presumption that her Guidelines sentence was reasonable.

This court reviews the substantive reasonableness of a sentence for abuse of discretion. *United States v. Miller*, 978 F.3d 746, 753 (10th Cir. 2020). In conducting this review, we consider "whether the length of the sentence is reasonable given all of the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *Id.* (quotation marks omitted). We reverse "only if it is arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Gantt*, 679 F.3d

28

1240, 1249 (10th Cir. 2012) (internal quotation marks omitted). "We will, of course, take into account the totality of the circumstances," but "we do not reweigh the sentencing factors; rather, we ask whether the sentence fell within the range of rationally available choices that the facts and law at issue can fairly support." *Miller*, 978 F.3d at 754 (internal quotation marks omitted). "To obtain relief, [the defendant] must show that the actual sentence imposed was outside this range of reasonableness." *United States v. McBride*, 633 F.3d 1229, 1232 (10th Cir. 2011). And "[w]e presume a sentence is reasonable if it is within the properly calculated Guidelines range." *Miller*, 978 F.3d at 754 (internal quotation marks and brackets omitted). "The defendant bears the burden of rebutting the presumption that a Guidelines sentence is reasonable." *Id.*

The district court sentenced Ms. Hayman to a term of 120 months' imprisonment. This sentence was consistent with the Guidelines recommendation of 120 months. Accordingly, it is Ms. Hayman's burden to rebut the presumption that this sentence was reasonable.

Ms. Hayman has not met this burden. Her arguments are, at bottom, contentions that the district court should have weighed the factors differently. For example, Ms. Hayman argues that the court "failed to recognize" that Ms. Hayman's plan was never going to succeed, Appellant's Br. at 31, that her past conduct did not result in "actual violence, *id.* at 32, that her intellectual disability causes "profound impairment in her judgment and critical thinking," Reply Br. at 8, and that the special conditions imposed on Ms. Hayman coupled with her need for 24/7 care "could

sufficiently address the court's concerns regarding dangerousness," *id.* at 9. But "no algorithm exists that instructs the district judge how to combine the factors or what weight to put on each one." *United States v. Barnes*, 890 F.3d 910, 916 (10th Cir. 2018). And our job on appeal is not to "reweigh the sentencing factors," but rather to "ask whether the sentence fell within the range of rationally available choices that the facts and law at issue can fairly support." *Miller*, 978 F.3d at 754 (internal quotation marks omitted).

Here, the district court considered the relevant § 3553(a) factors at length— including Ms. Hayman's history and characteristics, the seriousness of the offense, and the need to protect the public from further crimes by Ms. Hayman—in fashioning her sentence. And it weighed those factors in deciding to impose a Guidelines sentence. Although Ms. Hayman may have weighed the factors differently, she has not shown that the district court's sentence was "arbitrary, capricious, whimsical, or manifestly unreasonable." *Barnes*, 890 F.3d at 915 (quotation marks omitted). Accordingly, the district court did not abuse its discretion in imposing a 120-month sentence.

### III.    CONCLUSION

Based on the foregoing analysis, we AFFIRM Ms. Hayman's sentence.

Entered for the Court

Carolyn B. McHugh
Circuit Judge